IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION

| | | |
|---|---|---|
| EMILY BROWN, as parent and guardian of a minor child, T.B., | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:19-cv-168-ALM-KPJ |
| ERIC COULSTON and the CITY of DENTON, | § § § § | |
| *Defendants.* | § | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Emily Brown, as parent and guardian of T.B., a minor child, brings this action against the above-named Defendant and, in support thereof, states the following:

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 2

JURISDICTION AND VENUE ............................................................................................ 3

PARTIES ................................................................................................................................ 3

FACTS .................................................................................................................................... 4

Policies Regarding School Resource Officers ...................................................................... 5

Officer Eric Coulston Uses Excessive Force to Unnecessarily Restrain T.B. on
April 30, 2018 ......................................................................................................................... 6

      A.    First Use of Excessive Restraint .............................................................. 7

      B.    Second Use of Excessive Restraint ........................................................ 8

      C.    Third Use of Excessive Restraint ......................................................... 10

      D.    Fourth Use of Excessive Restraint ....................................................... 11

CAUSE OF ACTION: Use of Excessive Force in Violation of the Fourth Amendment ........... 13

CAUSE OF ACTION: Rehabilitation Act of 1973 .................................................................. 14

CAUSE OF ACTION: Americans with Disabilities Act .......................................................... 15

JURY DEMAND .................................................................................................................. 16

REQUEST FOR RELIEF .................................................................................................... 16

## **INTRODUCTION**

This is an action for damages brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973 for discrimination and the violations of civil rights and privileges guaranteed Plaintiff by the United States Constitution and under the common law of the State of Texas.

## JURISDICTION AND VENUE

1.     This is a civil rights action arising under 42 U.S.C. § 1983, the Americans with Disabilities Act (42 U.S.C. § 12101; "ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794; "Rehab Act"), and the Fourth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

Venue in this district is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this district, and under § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

2.     Plaintiff Emily Brown is the parent and guardian of a minor child (hereinafter "T.B."). T.B. is now 11 years old. At all times relevant to this lawsuit, he was enrolled as a student in Denton Independent School District ("DISD").

3.     Defendant City of Denton ("The City") is a municipality organized under the laws of the State of Texas.   Both the Denton Independent School District and Denton Police Department ("DPD") are political subdivisions of the City of Denton.  The City may be served with process through its city secretary, Rosa Rios, at 215 E. McKinney St. Suite 100, Denton, TX 76201.

4.     At all times relevant to this lawsuit, Defendant Eric Coulston was continuously employed as a peace officer by the Denton Police Department. At all times relevant to this lawsuit, pursuant to a written agreement between the entities, DPD employed and DISD used Officer Coulston as a School Resource Officer ("SRO").  His duties included responding to calls at Robert E. Lee Elementary ("Lee Elementary," renamed Alice Moore Alexander in 2018). At all times relevant to this lawsuit, Officer Coulston was acting under color of state law.  Officer Coulston has been

served and has made an appearance through his counsel of record, Kevin M. Curley and William Andrew Messer of Messer, Rockefeller & Fort, PLLC, 6371 Preston Rd. Suite 200, Frisco, TX 75034.

## FACTS

5. T.B. is now 11 years old. He was enrolled as a student at Robert E. Lee Elementary ("Lee Elementary," renamed Alice Moore Alexander in 2018) in Denton Independent School District for the 2017-2018 school year.

6. Doctors diagnosed T.B. with Autism Spectrum Disorder ("ASD") when he was six years old. ASD is a developmental disability characterized by social and communication impairments and by restricted interests and repetitive behaviors. ASD makes it difficult for T.B. to socialize, which he finds frustrating. When he gets upset, he sometimes needs to be alone to "reset" and calm down. T.B. has never had serious behavioral issues at home.

7. The school, family, and family advocates adopted an Individualized Education Plan ("IEP") and Behavior Intervention Plan ("BIP") for T.B. at Lee Elementary on October 11, 2017.

8. T.B.'s BIP identifies strategies for educators working with him, including the use of non-verbal gestures or other alternative means of communication, as well as de-escalation techniques when teachers notice signs that T.B.'s frustration is increasing.

9. The IEP lists potential consequences for behavior issues, including teacher-initiated breaks, an opportunity to cool down in a special spot in his general education classroom or the special education classroom, private discussions with T.B., and parent conferences. The IEP does not mention the use of isolation or physical restraint.

10. As described below, the City (through DISD and Lee Elementary) utterly failed to follow the agreed-upon accommodations outlined by T.B.'s IEP and BIP. Instead, it physically abused

him in a manner that other schoolchildren without ASD are not subjected to (and that no child should be subjected to).

11. T.B.'s parents chose Lee Elementary because his former school did not have the resources to properly educate their son and safely handle his behavioral challenges. DISD administrators and teachers assured the family that Lee Elementary had the resources to educate T.B. safely.

12. At the time of this incident, T.B., a fifth grader, was approximately four feet tall and weighed approximately eighty-five pounds.

### Policies Regarding School Resource Officers

13. The City uses law enforcement officers of the Denton Police Department as "School Resource Officers" ("SROs") at schools in DISD.

14. The City's policy regarding SROs is outlined in a Memorandum of Understanding ("MOU") between DISD and the Denton Police Department.

15. The MOU states, "The mission of the SRO program is the reduction and prevention of school related crime committed by juveniles and young adults." It further states that "The officers assigned to the SRO Program are, first and foremost, Law Enforcement Officers. SRO's are responsible for carrying out all duties and responsibilities of a police officer . . . ."

16. In other words, it is the official City policy of that SROs approach their work in schools *in the same way* they approach their work as law enforcement officers *outside of schools*.

17. Moreover, the MOU provides absolutely no guidelines regarding how SROs should conduct themselves around students, let alone students with known disabilities. The MOU also does not indicate that SROs are to receive *any* special training regarding their role and conduct while working with students.

18.     Despite this focus on criminal law enforcement, the MOU delineates "SRO Duties and Responsibilities," and these include "Assisting staff with unusual or temporary problems related to school discipline."

19.     Taken together, these facts constitute a written policy of the City that SROs apply methods and standards associated with adult criminal law enforcement, even when the SRO is assisting with non-criminal "discipline" of young schoolchildren.

20.     Moreover, the City employs SROs district-wide in the same manner that Officer Coulston was employed at Lee Elementary.  As such, it is the widespread practice of the City to allow, and even encourage, the use of adult criminal law enforcement methods in the non-criminal discipline of schoolchildren.  Additionally, such use of SROs discriminates against children with behavioral disabilities because (a) they are more likely to act in a non-conforming manner and therefore incur "discipline," and (b) City policy makes absolutely no distinction between the conduct authorized for and expected of SROs in dealing with children with disabilities and those without.

### Officer Eric Coulston Uses Excessive Force to Unnecessarily Restrain T.B. on April 30, 2018.

21.     In the early afternoon on April 30, 2018, Julie Mulvanny, a special education teacher at Lee Elementary, called Officer Coulston to the elementary school.  She asked him for help with T.B., who had allegedly committed some minor infractions.  There was no emergency, no threat of imminent, serious harm to anyone, and Officer Coulston was not investigating a crime.

22.     Officer Coulston's body camera captured the following events, video attached hereto as Exhibits 1 and 2.

23.     Mulvanny was attempting to get T.B. to leave the classroom, apparently to go to another class, and was having difficulty getting T.B. to cooperate.  T.B. at this time was sitting on the floor

near the corner of the room. He was not causing any other kind of disturbance, nor was he acting violently or threatening anyone physically. No other children were nearby.

24. Officer Coulston asked if Mulvanny, who had a hold on one of T.B.'s arms and was trying to get him to stand up, needed help. When she said yes, he grabbed T.B.'s other arm and jerked him upwards. When T.B. did not stand, Officer Coulston told Mulvanny to let go, grabbed both of T.B.'s arms, and forced them to wrap around T.B.'s body, like a straitjacket, so that T.B.'s upper body movement was restricted entirely. T.B. wrapped his legs around a nearby chair.

### A. First Use of Excessive Restraint

25. Officer Coulston then grabbed under one of T.B.'s knees and hoisted him into the air, stretching T.B.'s legs awkwardly so that one of them was pulled toward his head while the other dangled below. T.B. kicked his legs in the air to try and maneuver himself out of Officer Coulston's hold, but Officer Coulston continued to carry him through the hallway and into the SOAR room (an empty room used to isolate students). Officer Coulston handled T.B. in this manner even though there was no emergency and T.B. posed no risk of imminent harm to anyone. Mulvanny followed Coulston and T.B. to the SOAR room.

26. Upon arriving at the SOAR room, Mulvanny opened the door and Officer Coulston immediately pitched T.B. face-first onto the floor, holding his neck down so that T.B. could not move his head. Officer Coulston forced T.B.'s legs out from under him. He then knelt on T.B.'s back, struggling to gain control over his body. T.B. attempted to stand up, but Officer Coulston forced him down and knelt on his back. Officer Coulston grabbed the back of T.B.'s neck and pushed his head to the ground. Officer Coulston then asked, "Do you want the handcuffs?" and T.B. grunted loudly. T.B.'s face was bright red. Mulvanny took T.B.'s shoes off and put them outside of the room.

27. Officer Coulston continued to kneel on T.B.'s back while T.B. screamed and struggled. Coulston demanded that T.B. not kick his legs, and T.B. screamed with anguish for Coulston to get off him. Coulston told T.B. to give him his hand so that he could handcuff him, and T.B. cried "no." He again screamed for Coulston to get off. Officer Coulston said, "Can't do that, buddy."

28. Officer Coulston grabbed T.B.'s wrists and put them into handcuffs, without double-locking them to keep them from cinching tighter. He folded T.B.'s legs back, crossing them, and held them to his rear end. T.B. repeatedly screamed in anguish for him to get off, but Officer Coulston told him "no." Coulston then lifts T.B.'s hands up into the air while bending them back awkwardly at the wrists, while T.B. screamed.

29. Officer Coulston stayed on top of T.B. for about five minutes before finally getting off. About a minute later, Officer Coulston helped T.B. sit up and moved him to sit against the wall. This movement revealed red abrasions above T.B.'s knees.

B. **Second Use of Excessive Restraint**

30. While T.B. was sitting against the wall, Officer Coulston told him, "Everything you do right now is being recorded and I'm going to show the video to your parents." Upset at this, T.B. blew a raspberry at him. Even though this action did not constitute an emergency or pose a risk of imminent harm to anyone, Officer Coulston grabbed T.B. and forced him to the ground, saying, "If you're going to spit—."

31. Due to the position T.B. was sitting in when Coulston decided to push him face down into the floor again, T.B.'s handcuffed arms became caught under his legs. Officer Coulston forcefully pulled them around behind his back while T.B. screamed in pain. Officer Coulston knelt on T.B.'s backside while he tried to stop him from struggling. He forced T.B.'s legs down and eventually moved to sit on them.

32. With Officer Coulston sitting on his legs and holding his arms, T.B. started swinging his head, the only thing still under his control, and hitting it on the carpet. Officer Coulston jerked T.B.'s arms back forcefully enough to lift his head and upper body into the air. Officer Coulston held T.B. suspended in the air like that for a few seconds before releasing him. He then pushed T.B.'s head into the ground and held it there for around 30 seconds while T.B., helpless and in pain, screamed.

33. About a minute later, with Officer Coulston still sitting on his legs, T.B. started swearing. Officer Coulston forcefully yanked his arms back while awkwardly bending his wrists against the handcuffs. T.B. screamed in pain, started swinging his head side-to-side, and then hit his head against the floor. Officer Coulston then pushed T.B.'s head into the ground, holding it there for about 20 seconds, while T.B. cried and screamed in pain.

34. Coulston held T.B. face down on the floor for several more minutes before finally allowing him to sit up. T.B. sat still for about ten minutes before Officer Coulston removed his handcuffs. At this point, T.B. had been physically restrained and/or held in isolation for nearly half an hour.

35. For about the next nine minutes, T.B. attempted to relax by tearing up pieces of tissue paper, which was a technique the school had approved of in the past.

36. By this time, Mulvanny and Coulston had been joined by Matt Nelson, a behavioral specialist for DISD.

37. In response to nothing more than T.B. throwing pieces of tissue paper in the general direction of Mulvanny, Nelson and Coulston grabbed T.B., each holding one arm, and carried him back over against the wall.

38. Nelson and Officer Coulston held T.B.'s wrists to his side for about two minutes, and both threaten to put T.B. back in handcuffs.

39. Nelson specifically said, "If you start resisting, I'm going to ask Officer Coulston just to go ahead and use the handcuffs." It is not clear what Nelson was referring to as "resisting," and certainly would not have been clear to T.B., who was doing nothing more at the time than making an occasional grunting noise and futilely (in other words, meekly and in a completely non-threatening manner) trying to extract his small 10-year-old arm from Nelson's grasp.

40. After releasing T.B., Nelson and Coulston have him back up against the wall and restrained by each arm barely a minute later.

41. Throughout this incident, Coulston, and then Nelson, repeatedly use physical restraint in response to T.B.'s simple failure to obey arbitrary commands.

### C. Third Use of Excessive Restraint

42. When they released his arms the second time, T.B. tossed the tissues at Nelson and Officer Coulston. Officer Coulston said, "Next time you do that I'm putting you in handcuffs." About a minute later, T.B. picked up some pieces of tissue. Even though T.B. had not thrown the tissue pieces, Nelson grabbed T.B.'s arm and pried the tissues out of his hand.

43. T.B. then made a rude gesture towards Nelson and jerked his body awkwardly to the side. Coulston and Nelson wrestle him to the ground and handcuff him.

44. Although the situation did not constitute an emergency and T.B. posed no threat of imminent harm to anyone, Nelson and Officer Coulston both forced him to the ground face down. Nelson initially held down T.B.'s legs with his hands, and then moved to sit on them. Officer Coulston knelt on his back and forced his arms up into handcuffs, again bending his wrists backwards to gain compliance. T.B. screamed in pain repeatedly and cried for Coulston to get off.

45. Nelson and Coulston repeatedly say that T.B. must "show them that he's ready" to be let out of the handcuffs and allowed to sit up, despite the fact that T.B. had never done anything to

put anyone in physical danger. In other words, a failure to obey Coulston's and Nelson's commands to the letter resulted in extreme physical restraint by being placed in handcuffs and held face down on the floor. On more than one occasion, T.B.'s simple attempts to sit up result in being forcibly pressed back down into a prone position on his stomach. It appears that this was all done in an attempt to "teach T.B. a lesson," rather than in response to a genuine emergency or threat.

46. T.B. was forced to lay face down on the ground like this for almost fifteen minutes, with Officer Coulston repeatedly pushing him down and Nelson holding his legs down. After he was allowed to sit up, T.B. sat quietly for over five minutes before Coulston removed his handcuffs. While T.B. leaned quietly against the wall, Nelson continued to try to force T.B. to communicate verbally. In fact, Nelson explains to T.B. that Officer Coulston had set up "his rule" that in order to be taken out of the handcuffs, T.B. had to ask Coulston to be taken out. This only underscores the fact that the handcuffs were being used to teach a lesson, rather than for safety purposes.

        D.      **Fourth Use of Excessive Restraint**

47. For approximately the next ten minutes, T.B. was almost perfectly compliant with Nelson's requests and cleaned up the tissue paper from the floor. Throughout this period he was calm. However, this still was insufficient for Nelson to release T.B. from the SOAR room. Frustrated, T.B. went back to his position against the wall and makes grunting responses to Nelson's requests. At no point during this time did T.B. act violently or physically out of control.

48. Nelson mentioned that T.B.'s mother is on her way to pick him up. Upset by this, T.B. scooted towards the door, cursed at Nelson and made a rude gesture. While inappropriate, this mild expression of frustration in no way threatened anyone in the room with physical harm.

49. Nelson and Officer Coulston again grabbed his arms and dragged him back to the wall. For no apparent reason, Nelson crossed T.B.'s arms to twist around his body and held them there.

Coulston then assisted him in holding one of T.B.'s arms. T. B. whimpered helplessly as Nelson knelt heavily on T.B.'s thigh while holding his leg stretched out in front of him. During this time, Officer Coulston also grabbed the back of T.B.'s neck, pushing him forward. Because Officer Coulston was pushing T.B. forward while Nelson knelt on his legs, they both forced T.B. into a position where his diaphragm was unable to expand. This caused T.B. to experience positional asphyxiation. Officer Coulston and Nelson held him in this position for almost a minute.

50. T.B.'s mother arrived shortly thereafter. In total, T.B. was isolated in the room and subjected to multiple instances of forceful restraint without his mother present for roughly an hour and twenty minutes. His mother did not realize the extent of his injuries until they arrived home. Worried for the safety of T.B., she called the police that night.

51. As a result of the assault by Officer Coulson, T.B. suffered injuries and severe, lasting pain to his head, wrists, back, neck, and legs. T.B. also suffered psychological injuries including emotional anguish and fear. Even though T.B. transferred to a new school outside of DISD, he is still fearful of walking to other rooms with his teachers because of the trauma inflicted upon him by the Defendant.

52. T.B. was subjected to this unlawful abuse because of his autism.

53. On information and belief, neither DISD nor the DPD ever disciplined Officer Coulston for this use of force against T.B. In fact, DISD's official statement stated that "[Officer Coulston] acted in a manner that best protected the student, other students, and the staff." It went on to say that Officer Coulston is still employed by DPD as a school resource officer at DISD.

54. On information and belief, DISD did not discipline Matt Nelson or Julie Mulvanny for their roles in the incident.

55. Indeed, when the story of what happened to T.B. was investigated by the media, the City of Denton admitted that "restraints can only be used in situations where the student is posing an imminent, serious physical threat of harm to himself/herself or property," but stated, "In this incident, the officer's assessment of the situation was that the child was posing a serious threat of injury to himself or others, and the decision to use restraints was made only when the child posed a serious threat to himself or others. Once the child was calm, the restraints were removed."

56. This statement grossly misrepresents what happened. As described in detail above, T.B. was never a serious threat to himself or others. Furthermore, the detention involved excessive force beyond the use of simple restraint, and even beyond the use of handcuffs, a method of restraint generally reserved for adult criminal suspects. Such force was used repeatedly over the course of multiple hours while T.B. was already isolated such that *he couldn't possibly have hurt anyone.* Finally, T.B. remained handcuffs for long stretches of time even after he had calmed down.

57. In the same statement, the City stated that a review of the incident described in this Complaint was made and that Coulston's conduct was not found to violate City policy. As such, the City has publicly admitted that it is its policy to use unreasonable levels of physical force for the simple discipline of disabled students even when they do not represent any threat of harm to themselves or others. This is discrimination in violation of the ADA and Rehab Act.

## CAUSE OF ACTION

### Use of Excessive Force in Violation of the Fourth Amendment
### Pursuant to 42 U.S.C. § 1983

58. Plaintiffs incorporate by reference all allegations in the foregoing paragraphs.

59. The Fourth Amendment to the U.S. Constitution protects an individual's right to be free from objectively unreasonable uses of force that are excessive to the need.

60.     Defendant Eric Coulston's assault of T.B., as described in the foregoing paragraphs, was an objectively unreasonable and excessive use of force under the circumstances. Officer Coulston's actions violated T.B.'s clearly established constitutional rights. At all times relevant, Officer Coulston acted under color of state law and is liable pursuant to 42 U.S.C. § 1983. Officer Coulston's actions were intentional, malicious, and reckless and showed a callous disregard for Plaintiff T.B.'s rights. Officer Coulston's actions directly and proximately caused Plaintiff T.B. to suffer significant physical and psychological injuries. Accordingly, Officer Coulston is liable to T.B. for compensatory and exemplary/punitive damages.

**Discrimination and Failure to Accommodate Under the Rehabilitation Act of 1973**

61.     Plaintiffs incorporate by reference all allegations in the foregoing paragraphs.

62.     The City receives federal funds and thus follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

63.     The implemented regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as municipalities and public school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

64.     Plaintiffs assert that because the City failed to provide T.B. a safe and non-hostile educational environment, and that such failures as noted above have together and separately contributed to violating T.B.'s rights pursuant to Section 504 and the federal rules and regulations promulgated pursuant thereto.

65. As such, T.B. has a private cause of action for violation of the regulations promulgated under Section 504 due to the acts and omissions by the City.

66. In addition and in the alternative, the failures denoted herein by the City were a gross deviation from professional standards of care.

67. In addition and in the alternative, T.B. was a victim of intentional discrimination by the City.

68. In addition and in the alternative, T.B. was a victim of disparate impact under Section 504 due to the acts and omissions of the City.

69. The acts and omissions of the City specifically undermined and interfered with T.B.'s rights pursuant to Section 504, and he was a victim of discrimination based upon disability.

70. The acts and omissions of the City constituted gross misjudgment, bad faith, and/or deliberate indifference to T.B.'s rights as an individual with a disability.

**Discrimination and Failure to Accommodate Under the Americans with Disabilities Act**

71. Plaintiffs incorporate by reference all allegations in the foregoing paragraphs.

72. In addition and in the alternative to the above, the facts as previously described demonstrate violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq. ("ADA").

73. T.B. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

74. The City is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

75. The City and its schools are facilities and their operation constitutes a program and services for ADA purposes.

76. Specifically, and separate and apart from his Section 504 cause of action, T.B. alleges that the City failed and refused to reasonably accommodate and modify services to him, in violation of Title II of the ADA.

77. T.B. was a victim of discrimination based upon disability by the acts and omissions of the City.

78. Such failures caused injuries to T.B.

79. T.B. has a private cause of action against the City for their failure to follow relevant regulations promulgated pursuant to the ADA.

80. The acts and omissions of the City amounted to gross misjudgment, bad faith, and/or deliberate indifference to T.B.'s rights as an individual with a disability.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court issue the following relief:

1. Assume jurisdiction over this matter;

2. Award compensatory damages, including but not limited to damages for emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, to Plaintiff;

3. Award actual damages to Plaintiff;

4. Award Plaintiff punitive and exemplary damages as may be awarded by the trier of fact;

5. Award Plaintiff the costs of this lawsuit, including reasonable and necessary attorney fees and expert fees;

6. Award Plaintiff pre-judgment and post-judgment interest as allowed by law; and

7. Grant any other relief, at law or in equity, which this Court deems just and proper.

Respectfully submitted,

By: */s/ Don Tittle*
    Don Tittle
    Texas Bar No. 20080200
    don@dontittlelaw.com
    Roger Topham
    Texas Bar No. 24100557
    roger@dontittlelaw.com

LAW OFFICES OF DON TITTLE, PLLC
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
214/522-8400
214/389-1002 – Fax

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing has been served upon counsel for Defendant Coulston by electronic service via the Court's CM/ECF system on this the 30th day of May, 2019.  Defendant City of Denton, which has not made an appearance in the case, will be served by mail through its city secretary, Rosa Rios, at 215 E. McKinney St. Suite 100, Denton, TX 76201.

    */s/ Roger Topham*
    Roger Topham