UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EMILY BROWN, as parent and guardian of minor child, T.B. | § § § | |
| v. | § § | CIVIL ACTION NO. 4:19-CV-168-SDJ |
| ERIC COULSTON and the CITY of DENTON | § § § | |

## MEMORANDUM OPINION & ORDER

Plaintiff Emily Brown brought this action on behalf of her son, T.B., against Officer Eric Coulston and the City of Denton ("the City") for alleged violations of T.B.'s rights under the Fourth Amendment, section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act ("ADA"). (Dkt. #11). Before the Court are Federal Rule of Civil Procedure 12(b)(6) dismissal motions filed by Officer Coulston, (Dkt. #12), and the City, (Dkt. #21). Officer Coulston asserts that he is entitled to dismissal based on qualified immunity. The City contends that it should be dismissed because Brown has failed to state a claim upon which relief can be granted. The City's motion requests, in the alternative to dismissal, that under Rule 7(a)(7) Brown be required to file a detailed reply to Officer Coulston's qualified immunity defense, and that the Court stay discovery.

After reviewing the motions, the parties' briefing, and the applicable law, the Court concludes that the dismissal motions should be **GRANTED**, and that the City's alternative motion requesting relief under Rule 7(a)(7) should be **DENIED as moot**.

### FACTUAL BACKGROUND

At the time of the events made the basis of this lawsuit, T.B. was a ten-year-old student attending the fifth grade at Alice Moore Alexander Elementary School (previously named Robert E. Lee Elementary School and referred to here as "Alexander Elementary") in Denton, Texas. He was approximately four feet tall and weighed about eighty-five pounds. T.B. had previously been diagnosed with Autism Spectrum Disorder ("ASD"). Brown describes ASD as a developmental disability characterized by social and communication impairments and by restricted interests and repetitive behaviors. Brown asserts that ASD makes it difficult for T.B. to socialize, which he finds frustrating, and when T.B. gets upset, he sometimes needs to be alone to "reset" and calm down. (Dkt. #11 ¶ 6).

Brown's suit arises from an incident at the elementary school on April 30, 2018. In the early afternoon, Julie Mulvanny, a special education teacher, called Officer Coulston to the school.[1] She asked Officer Coulston for help with T.B., who, according to Brown, had committed "some minor infractions." Officer Coulston's body camera captured the events that followed over approximately the next two hours. Brown attached the video captured by Officer Coulston's body camera to her Second Amended Complaint, *see* (Dkt. #11-1, #11-2), and has asked the Court to treat the

---

[1] Alexander Elementary School is part of the Denton Independent School District ("DISD"). DISD and the City have an arrangement, documented by a Memorandum of Understanding ("MOU"), under which the City's police officers serve as School Resource Officers ("SRO") for DISD schools. Brown attached an MOU to her response to the City's motion, (Dkt. #23-1, Ex. A), but it does not include Alexander Elementary among the listed schools. The City, however, has acknowledged that the MOU's procedures apply to Alexander Elementary. (Dkt. #24 ¶ 3). Officer Coulston was an SRO for Alexander Elementary at the time of the events leading up to this lawsuit.

video as part of her complaint, *see, e.g.*, (Dkt. #23) (responding to the City's contention that she failed to make detailed factual allegations, Brown references, inter alia, Officer's Coulston's body camera video as an integral part of her description of the facts).

The Court is "entitled to consider any exhibits attached to the complaint, including video evidence. In such an instance, the court is not required to favor plaintiff's allegations over the video evidence." *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (citations omitted) (per curiam) (citing *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). Here, Officer Coulston's body camera video provides the best evidence of the events at the elementary school on the afternoon of April 30, 2018. Accordingly, where Brown's allegations depart from the video, the Court will consider the video to provide the most accurate depiction of events.

As seen on the officer's body camera, T.B.'s teacher, Ms. Mulvanny, was attempting to have T.B. leave the classroom, but he would not cooperate. Instead, T.B. climbed into a wall cubby and ignored Mulvanny's instruction that he must leave the room. Mulvanny then pulled T.B. out of the cubby and attempted to lead him out of the room, but T.B. resisted. At this point, Officer Coulston asked Mulvanny if she needed help, and she assented. Initially, Officer Coulston took one of T.B.'s arms and Mulvanny took the other arm, in an attempt to remove T.B. from the classroom. But T.B. continued to resist and sat on the floor. Officer Coulston then instructed Mulvanny to let go of T.B. and Coulston made an initial, unsuccessful attempt to pick

up T.B. T.B. continued to resist, wrapping his legs around a chair. Officer Coulston then successfully picked up T.B. and carried him out of the classroom, into another room down the hall with no furniture in it. In her complaint, Brown refers to this room as the "SOAR room." T.B. resisted and struggled with Officer Coulston during the time he was carried to the SOAR room, and his legs can be seen flailing in the video.

Upon arriving at the SOAR room, Mulvanny opened the door and Officer Coulston placed T.B. on the floor face down. T.B. continued to struggle and thrash about on the floor, ignoring Officer Coulston's command, reiterated several times, that he must be still. At this point, Officer Coulston used his body weight to hold T.B. down, and T.B. struggled, kicked, and screamed. Officer Coulston warned T.B. that he would be handcuffed if he did not calm down, referring to T.B. being in "the same position," i.e., having a similar episode, in recent days. T.B. continued to struggle, kick, and scream, and Officer Coulston handcuffed him. As the handcuffs were secured, T.B. screamed at Officer Coulston, "Get off me you fat bitch!" Officer Coulston told T.B. that he would stop holding him down when he became calm. For several minutes, T.B. remained unable to calm down, and continued to kick, scream, and thrash about while pulling against the handcuffs. During this time, Officer Coulston repeatedly told T.B. that he must calm down, and that when T.B. did calm down, Coulston would stop holding T.B. against the floor and "give him some space." After about five minutes in handcuffs, T.B. began to calm down and Officer Coulston

stopped holding him down with his body weight. A few minutes later, T.B. had become calm enough that Officer Coulston placed him in a sitting position against the wall.

As T.B. sat against the wall in handcuffs, he had stopped screaming but remained visibly agitated and angry and continued to pull against the handcuffs. Officer Coulston warned T.B. not to pull against the handcuffs, as he could hurt himself. T.B., however, only became more agitated and upset. T.B. then stood up and attempted to pull his handcuffed hands through his legs. Officer Coulston again warned T.B. that he would hurt himself and that T.B. had to sit back down or he would once again be placed on the floor. T.B. heeded the warning and sat down but remained very upset and continued to yell at Officer Coulston, who advised T.B. that he was being recorded and his parents would see his behavior. In response, T.B. spat at Officer Coulston.

After T.B. spat at him, Officer Coulston placed T.B. back on the ground face down, and T.B. began kicking, screaming, thrashing, and pulling at the handcuffs. Officer Coulston again used his body weight to hold T.B. down, however, at this time T.B. also began banging his head violently against the floor. Officer Coulston repeatedly told T.B. to "stop" and to "calm down," and that he would hurt himself. T.B. screamed and cursed at Officer Coulston, continued to struggle and kick, and could not calm down. T.B. also continued to try to bang his head against the floor. Ms. Mulvanny assisted Officer Coulston by holding T.B.'s head so that he did not hit it against the floor. Mulvanny also repeatedly urged T.B. to stop trying to hit his head and to calm down.

After several minutes had passed during which T.B. struggled, screamed, kicked, and attempted to hit his head on the floor, he gradually began to calm down. Officer Coulston again placed T.B. in a sitting position against the wall. At this time, T.B. had been handcuffed for approximately fifteen minutes. Although he was no longer screaming, cursing, struggling, and attempting to hit his head, T.B. remained agitated and breathing heavily. Officer Coulston advised T.B. that when his breathing slowed and he could calmly ask for the handcuffs to be removed, Coulston would remove the handcuffs. Over the ensuing eight minutes, T.B. calmed down to the point where he asked to have the handcuffs removed, and Officer Coulston took off the handcuffs. T.B. had been handcuffed for about twenty-five minutes during this time.

Shortly before the handcuffs were removed, Matt Nelson, a DISD behavioral specialist, arrived to assist in working with T.B. From this point forward Nelson primarily communicated with T.B., although both Officer Coulston and Ms. Mulvanny remained in the SOAR room. Nelson began by asking T.B. if he could sit calmly against the wall and if he needed any tissues. Mulvanny gave T.B. a box of tissues and T.B. then proceeded to tear up all of the tissues as well as the box itself. During this time T.B. remained agitated, breathing heavily and throwing the torn-up tissue, including at Mulvanny. Over approximately the next fifteen minutes, Nelson repeatedly warned T.B. that he needed to remain sitting against the wall calmly and not move about the room throwing the tissue at people. T.B. did not comply. Instead, he repeatedly moved away from the wall during this period,

-6-

throwing torn-up tissue at Mulvanny, Nelson, and Officer Coulston, breathing heavily, occasionally screaming at Nelson, and grunting in anger. Nelson and Officer Coulston repeatedly moved T.B. back to the wall, sometimes held him there, and warned T.B. several times that he would be handcuffed again if he refused to sit calmly as instructed by Nelson.

T.B. remained unable to become calm and compliant. Ultimately, when T.B. had moved away from the wall for approximately the fifth time and was continuing to throw torn-up tissues, Nelson removed some tissue from T.B.'s hand and T.B. lunged forward angrily. As T.B. appeared to be losing control, Officer Coulston handcuffed him again. T.B. resisted being handcuffed, again screaming, struggling, and thrashing. Nelson held T.B.'s legs, and Officer Coulston also used his body weight to hold T.B. face down. Once handcuffed, T.B. continued to struggle, thrash, spit, pull against the handcuffs, and scream for several minutes. Officer Coulston urged T.B. to calm down, as did Nelson. They also advised T.B. that they did not want him to hurt himself. Nelson, attempting to calm T.B., told him that a lot of people at the school cared about him and that his mother cared about him and wanted him to succeed. T.B. screamed in response that his mother did not care about him and wanted him dead.

After about fourteen minutes, T.B. became sufficiently calm that he was moved to sit against the wall, but remained in handcuffs. Five minutes later, T.B. had slowed his breathing and was able to ask Officer Coulson to remove the handcuffs, and they

were removed. T.B. was handcuffed for about twenty minutes during this time and had been in the SOAR room for about an hour.

Nelson then advised T.B. that he needed to make "good choices" to get out of the SOAR room, which included staying calm, not throwing the torn-up tissue, and not spitting. After giving T.B. time to consider these instructions, Nelson left the room and brought back a trash can. T.B. was asked to clean up the room, and he complied, putting the torn-up tissues into the trash can and then returning to sit against the wall. At this time, Nelson advised T.B. that he wanted to move him from the SOAR room to the front office area so his mother could pick him up. The news that his mother would be coming to get him made T.B. angry and upset once more, demonstrated by T.B. angrily grunting at Nelson. Nelson asked T.B. to "use his words," but T.B. only continued to grunt in anger and slap the wall. Nelson responded to this behavior by stating that he could help T.B. make "good choices," to which T.B. responded, "Shut up!" Shortly thereafter, Nelson advised T.B. that his mother (Brown) was on her way to pick him up. T.B. screamed "Fuck you, bitch!" in response.

T.B., again very angry, moved away from the wall, and Officer Coulston and Nelson moved him back to the wall and held him there but did not handcuff him. T.B. screamed and struggled for a few minutes as Officer Coulston and Nelson held him against the wall. During this time a school nurse checked on T.B., noting that he had redness around his knees from struggling on the carpet. The nurse left ice in a bag for T.B. When T.B. had calmed down sufficiently a few minutes later, Officer Coulston

and Nelson released him. T.B., now sitting against the wall again, grabbed the ice bag left by the nurse, tore it up, and scattered the ice on the floor.

Brown arrived in the room shortly thereafter. When she arrived, T.B. had been in the SOAR room for nearly eighty minutes. For the next ten minutes Brown primarily spoke to T.B., initially noting how angry he appeared to be and advising T.B. that his behavior was unacceptable. T.B. became calm during this interaction with Brown.

During the last thirty minutes captured on video by Officer Coulston's body camera, Brown discussed T.B.'s behavior with Nelson, Mulvanny, and Officer Coulston, as well as strategies for working with T.B. to control his anger. Brown mentioned problems with T.B.'s "blind rage" and the lack of resources in the community to address T.B.'s anger management issues. Nelson advised Brown that he and T.B.'s teachers were trying to have T.B. "use his words" to express himself, but that when T.B. became upset he had difficulty doing so. Mulvanny recounted that the problems on that day began with T.B. being "disruptive to other students." Nelson observed that this was the "second, third, or fourth Monday in a row" that T.B. had demonstrated similar behavioral issues. Officer Coulston advised Brown that T.B. had been put into handcuffs more than once during the incident.[2]

After Brown, Mulvanny, and Officer Coulston discussed various approaches to helping T.B. cope with anger issues going forward, they all left the SOAR room with T.B. and he went home with Brown.

---

[2] The video shows that Officer Coulston sustained a number of cuts to his right hand during the course of the events involving T.B. that afternoon.

## PROCEDURAL BACKGROUND

Brown has asserted a claim against Officer Coulston under 42 U.S.C. § 1983, contending that Coulston violated T.B.'s clearly established rights under the Fourth Amendment by using excessive force against T.B. during the April 30, 2018, incident at Alexander Elementary. Brown claims that, as a result of Officer Coulston's actions, T.B. "suffered injuries and severe, lasting pain to his head, wrists, back, neck, and legs." (Dkt. #11 ¶ 51). According to Brown, T.B. has also suffered "lasting psychological injuries, including emotional anguish and fear," and although T.B. has transferred to a new school outside DISD, "he is still fearful of walking to other rooms with his teachers because of the trauma inflicted upon him" by Officer Coulston. *Id.*

Brown also asserted claims against the City for violations of T.B.'s rights under section 504 of the Rehabilitation Act of 1973 and Title II of the ADA. The Rehabilitation Act claim turns on the City's alleged failure to provide T.B. a safe and non-hostile educational environment. In addition and in the alternative, Brown claims that the City intentionally discriminated against T.B. and that T.B. was the victim of disparate impact under section 504. Brown's ADA claim is premised on her contention that the City's schools and facilities failed to reasonably accommodate and modify services to T.B., a qualified individual with a disability, in violation of Title II of the ADA.

Officer Coulston moved for dismissal of Brown's section 1983 claim against him under Rule 12(b)(6), contending that the claim is barred by the defense of qualified immunity. The City has also filed a Rule 12(b)(6) dismissal motion, contending that

Brown's Rehabilitation Act and ADA claims can be brought only against DISD, not the City. In the alternative to dismissal, the City has requested that, under Rule 7(a)(7), the Court require Brown to file a detailed reply to Officer Coulston's qualified immunity defense, and that the Court stay discovery.

The Court will consider in turn Officer Coulston's and the City's dismissal motions.

## OFFICER COULSTON'S RULE 12(b)(6) MOTION

### I

Rule 12(b)(6) allows a party to move for dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. Under Rule 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a probability that the defendant is liable is not required, the plausibility standard demands "more than a sheer possibility." *Id.*

In assessing a motion to dismiss under Rule 12(b)(6), the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Legal conclusions "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. To determine whether the plaintiff has plead enough to "nudge[] their claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed if the court determines that the plaintiff pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

Judicial review of a Rule 12(b)(6) motion is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). In considering materials attached to a complaint, including video evidence, courts are not required to favor the plaintiff's allegations over the video evidence. *Hartman*, 685 F. App'x at 368 (citing *Scott*, 550 U.S. at 380–81).

When, as here, a defendant asserts a qualified immunity defense in a motion to dismiss, the court has an "obligation . . . to carefully scrutinize [the complaint] before subjecting public officials to the burdens of broad-reaching discovery." *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986); *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery.").

## II

Brown brings this civil rights action under 42 U.S.C. § 1983 for the alleged violation of T.B.'s constitutional rights by Officer Coulston. Section 1983 creates a private cause of action for violations of federally secured rights under color of state law. To state a section 1983 claim, the plaintiff must establish the deprivation of a right secured by the Constitution or federal law, that the deprivation occurred under color of state law, and that it was caused by a state actor. *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted). Brown asserts that Coulston, a City of Denton police officer, applied excessive force against T.B., depriving T.B. of his Fourth Amendment rights.

Officer Coulston contends that Brown's claim against him must be dismissed because he is protected by the defense of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (explaining that the doctrine protects government officials against individual civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *see also id.* (noting that "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact") (internal quotation marks and citations omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), so courts will not deny immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

To overcome qualified immunity, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 751 (quoting *Harlow*, 457 U.S. at 818); *see also Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (same). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236. However, the Supreme Court has "increasingly indicated a preference for first considering whether a purported right was clearly established by prior case law 'without resolving the often more difficult question whether the purported right exists at all.'" *Thomas v. City of New Orleans*, 883 F.Supp.2d 669, 682 (E.D. La. 2012) (quoting *Reichle*, 566 U.S. at 664). As the Court explained in *Camreta*

*v. Greene*, "a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages." 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011). The Court went on to observe in *Camreta* that, following this approach, "[a] court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit," and that "indeed, our usual adjudicatory rules suggest that a court *should* forbear resolving this issue." *Id.* at 705 (emphasis in original); *see also Reichle*, 566 U.S. at 664 (noting that "[t]his approach comports with our usual reluctance to decide constitutional questions unnecessarily"). Consistent with this precedent, the Court concludes that the right asserted by Brown was not clearly established at the time of Officer Coulston's challenged conduct, and therefore his motion to dismiss may be resolved by addressing step two of the qualified immunity analysis, without the necessity of resolving whether the right asserted by Brown exists.

## III

Because the law does not put the constitutionality of Officer Coulston's actions toward T.B. beyond debate, Coulston is entitled to qualified immunity. In a school setting, the law is not clearly established regarding use of force by police officers, particularly in regard to the use of handcuffs to restrain disruptive students. Officer Coulston's actions therefore could not have violated any "clearly established" constitutional right concerning excessive force. Further, Brown has failed to allege

that T.B. suffered a sufficient injury to survive a motion to dismiss. For these reasons, Officer Coulston's motion to dismiss will be granted.

## A

Once a defendant has invoked the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is unavailable. *See Collier v. Montgomery*, 569 F.3d 214, 217–18 (5th Cir. 2009) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised."); *see also McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). At the motion to dismiss stage of proceedings, a court must first find that "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). "[C]onclusory allegations and unsubstantiated assertions" cannot overcome the defense. *Miller v. Graham*, 447 F. App'x 549, 551 (5th Cir. 2011).

The qualified immunity defense may be overcome only if the plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735. When considering the "clearly established" element of the qualified immunity inquiry, a court must ask "whether the law so clearly and unambiguously prohibited [defendant's] conduct that '*every* reasonable official would understand that what he is doing violates [the law].'" *Morgan*, 659 F.3d at 371 (emphasis and alteration in original) (quoting *al-Kidd*, 563 U.S. at 741). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified

immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). To find that a right is "clearly established," a court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (quoting *al-Kidd*, 563 U.S. at 742). Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, — U.S. —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *al-Kidd*, 563 U.S. at 742). "It is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 732–33 (5th Cir. 2016)).

## B

Brown claims that Officer Coulston violated clearly established law concerning the use of excessive force. To establish an excessive force claim under the Fourth Amendment, a plaintiff must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). The reasonableness inquiry "requires analyzing the totality of the circumstances." *Plumhoff v. Rickard*, 572 U.S. 765, 774, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). Determining if the force used was excessive "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396,

109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A court must consider only the information available to the officer at the time and must recognize that officers often make split-second decisions in stressful situations. *Id*.

Here, Brown's excessive force claim requires the Court to examine similar cases involving such claims in the school context. "Students have a constitutional right under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures while on school premises." *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 621–22 (5th Cir. 2004) (citation omitted). However, "the nature of those rights is what is appropriate for children in school." *Milligan v. City of Slidell*, 226 F.3d 652, 654–55 (5th Cir. 2000). "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the school's custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *see also Flores v. School Bd. of DeSoto Parish*, 116 F. App'x 504, 510 (5th Cir. 2004) (noting that "[t]he Supreme Court and this circuit have . . . recognized that preservation of order in the schools allows for closer supervision and control of school children than would otherwise be permitted under the Fourth Amendment").

As the Fifth Circuit has explained, "[t]he Fourth Amendment's reasonableness standard must afford school officials with a relatively wide range [of] acceptable action in dealing with disruptive students." *Campbell v. McAlister*, 162 F.3d 94, 1998 WL 770706, at *4 (5th Cir. 1998) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (observing that, "maintaining security and order in

the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship"). Moreover, a student's "active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test." *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) (citing *Graham*, 490 U.S. at 396).

## C

Brown has failed to meet her burden to demonstrate that, under clearly established law, Officer Coulston's actions in restraining T.B. amounted to excessive force in violation of T.B.'s constitutional rights. To begin with, the particular context of Officer Coulston's challenged conduct must be examined. Here, Brown herself has attached to her complaint Officer Coulston's body camera video of the incident at T.B.'s school on April 30, 2018. The video captured by Officer Coulston's body camera confirms the following significant facts. First, although it is unclear exactly why T.B. was asked to leave a classroom,[3] it is clear that T.B. refused to do so despite repeated instructions from a school official, Ms. Mulvanny, and that T.B. physically resisted Mulvanny when she attempted to lead him out of the classroom. It is also clear that, when Officer Coulston began to assist Mulvanny in removing T.B. from the classroom, he vigorously resisted, and as Officer Coulston carried T.B. down the hallway to the SOAR room, T.B. continued to resist.

Second, once in the SOAR room T.B. could not calm down, refused to comply with requests and commands from Officer Coulston, and again vigorously resisted

---

[3] In the video, Mulvanny states that T.B. was being "disruptive to other students."

being physically restrained and later handcuffed. For more than an hour, T.B. could not calm down for any extended period of time and refused to become compliant. T.B. violently resisted being restrained, including screaming, kicking, thrashing, spitting, and trying to hit his own head against the floor. When handcuffed, T.B. pulled against the restraints, and, in one instance, T.B. attempted to pull his handcuffed hands through his legs. T.B. repeatedly cursed at Officer Coulston and other school officials during this time and was plainly agitated and angry, even when he was told that his mother, Brown, was coming to pick him up.

Third, throughout the incident, Officer Coulston repeatedly urged T.B. to calm down and sit against the wall, as did school officials Nelson and Mulvanny. During the brief periods of time that T.B. appeared to be controlling his anger, Coulston removed the handcuffs. But, because T.B. remained angry and upset for much of his time in the SOAR room and continued to act out, he was restrained and handcuffed more than once.

In sum, the video shows that over the course of about eighty minutes, Officer Coulston restrained several times a ten-year-old special-needs student who was angry, upset, noncompliant, and combative, and who could have injured himself or others because he could not calm down and comply with Officer Coulston's and school officials' commands. During the episode, Officer Coulston used his body weight several times to restrain T.B. and also handcuffed T.B. on two occasions, the first time for approximately twenty-five minutes and the second time for approximately twenty minutes.

Brown has not identified any precedent of the United States Supreme Court or this circuit confirming that Officer Coulston's actions violated "clearly established" law on excessive force under the Fourth Amendment. Brown's failure to do so "dooms" her case against Officer Coulston. *See Vann*, 884 F.3d at 310 (affirming grant of summary judgment in officer's favor in an excessive force case when plaintiff failed to cite Supreme Court or Fifth Circuit precedent on applicable, "clearly established" law).

To the contrary, precedent within this circuit shows the opposite—that there is no clearly established law that a police officer may not handcuff or otherwise use his body weight to restrain a student, including a student who has special needs and is repeatedly disruptive, combative, noncompliant, and resisting the officer's commands. Courts in the Fifth Circuit have not squarely addressed what constitutes an objectively unreasonable use of handcuffs on a student. However, a number of decisions suggest that the restraint of disruptive, noncompliant students, including very young students and students with special needs, does not implicate the violation of constitutional rights. For example, in *Campbell,* the court considered allegations that a school official had used excessive force to remove a disruptive kindergartener from a classroom. 1998 WL 770706, at *1. The court noted that the student "had refused to leave the room or even stand up" after "[r]epeated requests that he voluntarily do so." *Id.*, at *4. The student alleged that the official "'slammed [the student] to the floor' and 'dragged [him] along the ground to the principal's office,'" which resulted in bruising. *Id.*, at *1. The court found that the use of force was

objectively reasonable because the "alleged efforts to subdue" the student "were fairly tailored to [the student's] admitted misbehavior." *Id.*, at *5.

In *Flores*, a special-education student and his mother sued various school-related agencies after an incident in which a teacher allegedly threw the student against a wall, placed his hands around the student's neck, and began to choke him while threatening bodily harm. 116 F. App'x at 510. The Fifth Circuit declined to recognize the plaintiffs' claim under the Fourth Amendment. The *Flores* court concluded that the student failed to state a claim "[g]iven th[e] prohibition against constitutional claims for corporal punishment, the special constitutional status of schoolchildren, and the fact that the momentary 'seizure' complained of in this case is not the type of detention or physical restraint normally associated with Fourth Amendment claims." *Id*.

In *Doe v. S & S Consol. I.S.D.*, a mother and her child sued school officials under section 1983 for wrapping the emotionally disturbed and disruptive student in sheets, duct-taping her mouth shut, placing her face down on a cot, and leaving her in an isolated room. 149 F. Supp. 2d 274 (E.D. Tex. 2001), *aff'd*, 309 F.3d 307 (5th Cir. 2002). The district court summarily dismissed, on qualified immunity grounds, the Fourth Amendment claim, finding that the plaintiffs failed to allege the violation of a clearly established right under the Fourth Amendment. *Id*. at 286–87. Rejecting the argument that the child had been unreasonably "seized" by school officials, the district court concluded that it "d[id] not believe that the amendment readily captures

school officials restraining a 'raging' child or placing her in a timeout room." *Id.* at 287. The Fifth Circuit affirmed.

In *Thomas v. City of New Orleans*, the court considered excessive force claims brought against New Orleans Police Department officers on behalf of a third-grade special education student. 883 F. Supp. 2d 669, 674–75 (E.D. La. 2012). The excessive force charge arose from the restraint and handcuffing of the student after an incident in which the student had an "alleged behavioral issue," following which school officials unsuccessfully attempted to lock the student in a closet and were physically restraining the student when police arrived. *Id.* at 674. The police officers' subsequent handcuffing of the student was characterized by plaintiffs as excessive force involving "an already terrified, unarmed, defenseless, child weighing in at less than 60 pounds, who did not resist arrest nor could resist arrest in restraints," and "was never violent." *Id.* at 675. After examining circuit precedent, the *Thomas* court dismissed the excessive force claim based on qualified immunity, concluding that the officers' conduct did not violate clearly established law. *See id.* at 686–88.

Citing *Flores* and *Doe*, the *Thomas* court explained that "[i]f the Fifth Circuit has declined to recognize school children's claims under the Fourth Amendment for *school officials'* use of restraining techniques," then similar claims against police officers responding to a school's request for assistance "cannot be analyzed in a way that is divorced from the school context." *Id.* at 688 (emphasis in original). The court went on to note that, "[t]he fact that this Court even has to speculate as to what standard to apply to the *police officers'* conduct toward a student here in order to

determine if their conduct was constitutionally permissible" was "determinative of the qualified immunity analysis: clearly established law does not put the constitutionality of the police officers' conduct beyond debate." *Id.* (emphasis in original); *see also Edmond ex rel. M.B. v. Lafayette Consol. Gov't*, Civil Action No. 16-0045, 2018 WL 344154, at *6 (W.D. La. Jan. 9, 2018) (unpublished) (citing *Thomas* and agreeing that excessive force claims against police officers concerning the restraint of students is "not an area of clearly established law" in this circuit).

Similarly, in *Mohamed for A.M. v. Irving Independent School District*, the court dismissed on qualified immunity grounds an excessive force claim against police officers for handcuffing a fourteen-year-old student alleged to have created a "hoax bomb" and brought it to school. 300 F. Supp. 3d 857, 869, 894–95 (N.D. Tex. 2018). Although the student was compliant and did not resist the officers, they allegedly "yanked his arms up behind his back so far that that his right hand touched the back of his neck," which caused the plaintiff "a lot of pain," and then the student was handcuffed and brought to the police station. *Id.* at 869–70. The *Mohamed* court concluded that the excessive force claim failed "because then-extant clearly established law would not have apprised reasonable officers in the Officer Defendants' position, that their alleged conduct related to handcuffing [the student] during the arrest would run afoul of the Fourth Amendment's prohibition on the use of excessive force." *Id.* at 895.

These cases confirm that the law in this circuit did not in April 2018, and does not now, "so clearly and unambiguously" prohibit Officer Coulston's conduct that

"*every* reasonable official would understand" that Coulston's actions violated T.B.'s constitutional rights. *Morgan*, 659 F.3d at 371 (emphasis in original) (internal quotation marks and citation omitted). Indeed, the law in this circuit confirms the opposite: a reasonable police officer in Coulston's place on April 30, 2018, would understand that restraining a noncompliant, angry, and combative student with handcuffs, even if the student is in elementary school and has special needs, would not run afoul of the student's Fourth Amendment rights.[4] For this reason, and because "existing precedent" likewise does not place "beyond debate" the question whether Officer Coulston employed unconstitutional excessive force against T.B., Coulston is entitled to qualified immunity and Brown's excessive force claim must be dismissed. *See Mullenix*, 136 S.Ct. at 308; *al-Kidd*, 563 U.S. at 742.

---

[4] The law in circuits across the country is not to the contrary. Recently, for example, the Eighth Circuit considered a case involving an excessive force claim against a police officer for, among other things, using excessive force in handcuffing a seven-year-old boy in the second grade. *See K.W.P. v. Kan. City Pub. Sch.*, 931 F.3d 813, 816 (8th Cir. 2019). In that case, after a student became involved in a confrontation with another student, and a police officer attempted to escort the student to the front office, the student resisted the officer and was handcuffed. *Id.* at 816–19. The court held that plaintiff could not meet the "clearly established" standard. *Id.* at 827–29. In reaching this conclusion, the Eighth Circuit observed that, "[b]oth the Fourth and Tenth Circuits have granted qualified immunity to school resource officers despite the officer handcuffing 'a calm, compliant ten-year-old,'" and another officer "handcuffing a student who 'posed no flight risk and was not combative.'" *Id.* at 829 (first quoting *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 186 (4th Cir. 2018), and then quoting *A.M. v. Holmes*, 830 F.3d 1123, 1130 (10th Cir. 2016)). The *K.W.P.* court reasoned that, "[i]f school resource officers who . . . handcuffed compliant children received qualified immunity, then no obvious violation results from . . . [the handcuffing] of K.W.P., an admittedly resistant child."). *Id.*

-25-

**D**

Officer Coulston asserts that Brown's excessive force claim also fails because her complaint does not allege anything more than a de minimis injury to T.B. as a result of Coulston's challenged conduct. The Court agrees.

"To succeed on an excessive force claim, [a plaintiff] must demonstrate that he suffered at least some form of injury from the defendant's actions that is more than de minimis." *Aguilar v. Robertson*, 512 F. App'x 444, 449 (5th Cir. 2013) (citation and internal quotation marks omitted); *see also Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2005) (same). The claimed injury can be one that is physical or psychological. *Ikerd v. Blair*, 101 F.3d 430, 434 n.9 (5th Cir. 1996).

In regard to physical injury, "[m]inor, incidental injuries that occur in connection with the use of handcuffs . . . do not give rise to a constitutional claim for excessive force." *Mohamed*, 300 F. Supp. 3d at 892; *see also Glenn*, 242 F.3d at 314 (concluding that "handcuffing too tightly, without more, does not amount to excessive force"); *Freeman v. Gore*, 483 F.3d 404, 416–17 (5th Cir. 2007) (finding no excessive force in a case involving arrestee's allegations that the deputies twisted her arms behind her back while handcuffing her, "jerked her all over the carport," and applied the handcuffs too tightly, causing bruises and marks on her wrist, since "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force"); *Tarver*, 410 F.3d at 751–52 (finding no excessive force when plaintiff failed to show requisite injury because he did "not allege any degree of physical harm greater than de minimis from

the handcuffing," specifically "acute contusions of the wrist and psychological injury from being handcuffed"); *Montes v. Ransom*, 219 F. App'x 378, 390 (5th Cir. 2007) (rejecting excessive force claim when plaintiff presented evidence of red marks and some swelling because "[s]uch minor injuries are inherently transient, are only de minimis, and are not actionable"). In the case of a psychological injury, "[o]nly substantial psychological injuries are sufficient to meet the injury element of a claim for excessive force under the Fourth Amendment." *Carter v. Diamond URS Huntsville, LLC*, Civ. A. H–14–2776, 2016 WL 8711499, at *5 (S.D. Tex. Sept. 30, 2016) (citing *Flores v. City of Palacios,* 381 F.3d 391, 397–98 (5th Cir. 2004)).

Here, Brown alleges that, as a result of Officer Coulston's actions, "T.B. suffered injuries and severe, lasting pain to his head, wrists, back, neck, and legs." (Dkt. #11 ¶ 51). Brown further asserts that "T.B. also suffered psychological injuries including emotional anguish and fear." *Id.* According to Brown, although T.B. has moved to a new school outside of DISD, "he is still fearful of walking to other rooms with his teachers because of the trauma" allegedly inflicted on him by Officer Coulston. *Id.*

Brown's conclusory allegations fail to state anything more than a de minimis injury to T.B. Brown alleges no specific facts to support the conclusion that T.B. incurred any significant or lasting physical injury from Officer Coulston. A plaintiff must plead "specific facts, not mere conclusory allegations" to state a claim for relief that is facially plausible. *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations must be enough to raise a right to relief above the speculative level, assuming all the allegations are true. *Twombly*, 550 U.S. at 555–56. Brown's unsupported allegations that T.B. "suffered injuries and severe, lasting pain to his head, wrists, back, neck, and legs," without more, do not articulate anything more than speculation as to whether T.B. actually suffered anything more than de minimis physical injury as a result of Officer Coulston's conduct. What is the nature of the injury to T.B.'s head, his wrists, or his back, neck, or legs? Brown does not say. How are T.B.'s alleged injuries of a "severe" or "lasting" nature?  Brown does not say. Has T.B. received any medical treatment or diagnosis of any kind for any of these alleged injuries? Again, Brown does not say. This is insufficient.

Likewise, Brown's allegations fail to plausibly state any substantial psychological injury sustained by T.B. based on Officer Coulston's actions. Brown provides only general references to "emotional anguish and fear," and being "fearful of walking to other rooms with teachers." These allegations, standing alone, fail to sufficiently allege any substantial psychological injury to T.B.

In sum, the allegations of injury in connection with T.B.'s interactions with Officer Coulston, including his restraint and handcuffing, are of no higher a degree than the alleged injuries in the above-cited cases, in which courts in this circuit concluded that the plaintiffs failed to allege more than a de minimus injury. Based

on this case law, the Court agrees with Officer Coulston that the allegations of injury are insufficient to state a plausible claim for excessive force.

*   *   *

For all of the foregoing reasons, Officer's Coulston's Rule 12(b)(6) motion is **GRANTED**. Brown's section 1983 claim against Officer Coulston for the alleged use of excessive force against T.B., in violation of T.B.'s rights under the Fourth Amendment, is **DISMISSED with prejudice**.

### THE CITY'S RULE 12(b)(6) MOTION

Turning to the City's Motion to Dismiss, Brown has alleged that the City has failed to take action such that it has violated section 504 of the Rehabilitation Act and Title II of the ADA. The City argues that Brown fails to state a claim against it and that she has instead alleged failures that should be attributed to DISD, a separate entity. (Dkt. #21).

### I

As previously discussed, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Legal conclusions "must be supported by factual allegations." *Id.* at 679.

Brown has brought her claims pursuant to section 504 of the Rehabilitation Act and Title II of the ADA. The relevant portion of section 504 states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The Fifth Circuit has explained that, "the evaluation of a claim for disability discrimination under the ADA and the Rehabilitation Act are substantially the same and '[t]he only material difference between the two provisions lies in their respective causation requirements.'" *Wilson v. City of Southlake*, 936 F.3d 326, 329–30 (5th Cir. 2019) (alteration in original) (quoting *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)). Under Title II of the ADA, "discrimination need not be the sole reason" for an exclusion or denial of benefits, but under section 504, the plaintiff must establish that disability discrimination was the sole reason for the exclusion or denial of benefits. *Id.* (quoting *Bennett-Nelson*, 431 F.3d at 454) (internal quotation marks omitted). Because of this overlap, the Court need not address the claims separately. *See id.* (analyzing an ADA claim and a section 504 claim together).

## II

Brown asserts that the City's failure to have a policy and train its officers on policing techniques specific to students,[5] and students with disabilities, creates a

---

[5] Any claim Brown makes that the City failed to have a general policy specific to students is outside the scope of Title II of the ADA and section 504 of the Rehabilitation Act; both acts can only cover qualifying individuals with disabilities and are not designed to

violation of the ADA and section 504. Brown has pled insufficient facts to support these legal conclusions.

To make a prima facie case under Title II of the ADA, a plaintiff must show (1) "that he is a qualified individual within the meaning of the ADA," (2) "that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity," and (3) "that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Windham v. Harris Cty.*, 875 F.3d 229, 235 (5th Cir. 2017) (internal quotation marks omitted) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). Brown fails to sufficiently plead any facts that would support an allegation that T.B. is "excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the [City]," and that such exclusion, denial, or discrimination is "by reason of his disability."[6]

Brown's policy-related claims against the City fall into three categories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation. All of these theories, which are

---

redress wrongs for individuals without disabilities. *See* 42 U.S.C. § 12132 (limiting the statute to qualified individuals with disabilities); 29 U.S.C. § 794(a) (same).

[6] Neither party disputes whether T.B. is a qualified individual with a disability.

attributed by Brown solely to the City's alleged failure to train its officers,[7] fail on their face for two reasons: (1) the minimal factual allegations made by Brown to support her claims against the City patently conflate the duties and responsibilities of DISD with those of the City; and (2) none of the City's purported failures are alleged to have occurred "by reason of" T.B.'s disability, a required element of both a Title II ADA claim and a section 504 claim. Thus, on their face, Brown's factual assertions are directed at the wrong governmental entity, and she has failed to adequately plead all of the required elements of her proposed Title II ADA and section 504 claims.

## A.

Brown's allegations conflate the City with DISD. She alleges that "the City (through DISD and Alexander Elementary)" failed to follow "agreed-upon

---

[7] The Fifth Circuit has not recognized municipal liability under the ADA and section 504 on failure to train theories. Other circuits have decided the issue in various ways. *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1297 n.4 (10th Cir. 2016) (stating that the Tenth Circuit has declined determine if a failure to train claim of discrimination exists under the ADA and noting other circuits have acted similarly); *Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006) (declining to determine if such a claim under the ADA exists); *see also Everson v. Leis*, 412 F. App'x 771, 779 (6th Cir. 2011) (unpublished) (holding that a plaintiff failed to show how the sheriff of a county without an epilepsy specific policy could be liable under the ADA); *id.* at n.3 (Moore, J. dissenting) (citing *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) ("[F]ailure to train officers on how to comply with the ADA is not intentional discrimination."); *Dillery*, 398 F.3d at 568 (holding that a failure to train affects all disabled persons and that a plaintiff cannot show intentional discrimination through failure to train). *But see Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir. 2008) (holding that under Title III a public accommodations failure to train can constitute a violation of the ADA).

The Supreme Court has recognized that liability is permitted under 42 U.S.C. § 1983, "under certain circumstances," "for constitutional violations resulting from [a municipality's] failure to train municipal employees." *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). But Brown has not brought a section 1983 claim against the City.

accommodations outlined by T.B.'s IEP and BIP[,]" (Dkt. #11 ¶ 10),[8] and that "the City and its schools are facilities and their operation constitutes a program and service for ADA purposes." (*Id.* ¶ 75). Critical to Brown's theory is her belief that "[DISD] and Denton Police Department ('DPD') are political subdivisions of the City of Denton." (*Id.* ¶ 3). Not so.

Neither party disputes that DISD is a separate political subdivision of the state than the City. *See* (Dkt. #21 at 2–3) (explaining that DISD is a separate policy maker than the City and that it is independent); (Dkt. #23 at 3, 5–6) (stating that Brown asserts her claims based on the City's independent liability and partnership with DISD through the MOU, not because of any relation to DISD). The City is both factually and legally separate from DISD. *See* TEX. EDUC. CODE ANN. § 11.151(a)–(b) (stating that the trustees of an independent school district have the "exclusive power and duty to govern and oversee the management of the public schools of the district"); *San Antonio ISD v. McKinney*, 936 S.W.2d 279, 283 (Tex. 1996) ("Although our independent school districts are creatures of the state and receive substantial funds for their operation from the state, they are independent political entities . . . ."). "An independent school district is a quasi-municipal corporation . . . [and] it is entrusted with the duty of managing the schools to the extent of the power delegated." *Sw. Broad. Co. v. Oil Ctr. Broad Co.*, 210 S.W.2d 230, 233 (Tex. Civ. App.—El Paso 1947, writ ref'd n.r.e.); *see also Austin ISD v. City of Sunset Valley*, 502 S.W.2d 670,

---

[8]An "IEP" is an individualized education plan. A "BIP" is a behavior intervention plan. Brown alleges that the school had both plans in place to provide techniques for the school, family, and family advocates to assist T.B. in communicating and helping him at school.

672 (Tex. 1973) (holding that a school district is not subject to a city's police power as a separate entity).

Thus, Brown has made no plausible factual allegation that the City knew of T.B.'s disability, his IEP and BIP, or that the City had agreed to provide any sort of accommodation for T.B. She only alleges that DISD had this knowledge, which, as discussed, is not the City.

## B.

Brown's legal theories are fatally undermined by the absence of a plausible allegation that the City knew of T.B.'s disability. Without this knowledge, the City could not have discriminated against T.B., denied T.B. any benefits, or failed to accommodate T.B. "by reason of [his] disability."

Brown seeks monetary damages, and "[a] plaintiff can recover money damages only if he proves the defendant committed a violation of the ADA or [Rehabilitation Act] and that the discrimination was intentional." *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). *See Windham*, 875 F.3d at n.5 ("To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff must also show that the discrimination was 'intentional' in the sense that it was more than disparate impact."). The Fifth Circuit has not defined intent, but it has previously required a plaintiff to prove "something more than 'deliberate indifference'" to show intent and has further stated that "intent requires that the defendant at least have actual notice of a violation." *Miraglia*, 901 F.3d at 575.

Other than conclusory statements that the City is liable for intentional discrimination and deliberate indifference, Brown has not alleged any facts to support such claims. She has not stated that the City was aware of T.B.'s alleged ASD diagnosis, or that the City intentionally caused T.B.'s interaction with Officer Coulston after being made aware of previous incidents. Instead, Brown relies solely on the City's alleged failure to train its officers specifically on interacting with students to establish intentional discrimination and disparate impact. This is not enough. *See J.V.*, 813 F.3d at 1298 (holding that a failure to train claim was insufficient to allege intentional discrimination).

Likewise, under a failure to accommodate theory, Brown's claims fail. A failure to accommodate claim under Title II requires the plaintiff to prove: "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the [public] entity; and (3) the entity failed to make reasonable accommodations." *Windham*, 875 F.3d at 236 n.8 (alterations in original) (quoting *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)). "A critical component of a Title II claim for failure to accommodate . . . is proof that 'the disability and its consequential limitations were known by the [entity providing public services].'" *Id.* (alterations in original) (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015)). Here, Brown has failed to allege that

the limitations of T.B.'s disability were known to the City or that T.B.'s ASD was known to the City.[9]

Ultimately, Brown fails to identify any act or omission of the City that occurred "by reason of" T.B.'s disability. Brown has failed to allege that the City knew of T.B.'s disability, should have known of T.B.'s disability, or that T.B.'s disability was obvious or that its impact was obvious. Without such knowledge regarding T.B., there is no reason to believe that, even if the City had implemented the policy referenced by Brown concerning students known to have special needs, it would have changed anything regarding T.B.'s interactions with Officer Coulston on April 30, 2018.

In sum, none of Brown's ADA and section 504 claims can survive a motion to dismiss because their factual premise conflates the City with DISD and they fail to plead that any of the City's purported violations of these statutes occurred "by reason of" T.B.'s disability, a requirement under both the ADA and section 504 of the Rehabilitation Act.[10]

---

[9] Again, Brown does not even allege that Officer Coulston knew of T.B.'s disability or limitations because of his disability.

[10] Brown also alleges that the City is liable for "gross deviation from professional standards of care," (Dkt. #11 ¶ 66), and "gross misjudgment, bad faith, and/or deliberate indifference to T.B.'s rights," (id. ¶ 70). The Fifth Circuit has held that "facts creating an inference of professional bad faith or gross misjudgment are necessary to substantiate a cause of action for intentional discrimination under § 504." *C.C. v. Hurst-Euless-Bedford ISD*, 641 F. App'x 423, 426 (5th Cir. 2016) (citing *D.A. ex rel. Latasha A. v. Hous. ISD*, 629 F.3d 450, 455 (5th Cir. 2010)). No such facts have been alleged here. Accordingly, these theories do not preserve Brown's claims against the City.

Brown also alleges that the City violated regulations promulgated under Section 504 and the ADA but does not specifically identify any. The Court need not identify regulations which may be applicable because Brown has failed to specify conduct which violates the ADA and section 504.

Accordingly, the City's motion to dismiss is **GRANTED** and Brown's claims against the City are **DISMISSED** for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Officer Eric Coulston's motion to dismiss, (Dkt. #12), and the City of Denton's motion to dismiss, (Dkt. #21), are **GRANTED**.

It is further **ORDERED** that Plaintiff's claims against Officer Coulston and the City of Denton are **DISMISSED with prejudice**.

It is further **ORDERED** that the City's alternative request under Rule 7(a)(7) is **DENIED as moot**.

**So ORDERED and SIGNED this 29th day of May, 2020.**

_____

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE